EQUITY DE PUERTO RICO, INC., a/c IGNACIO RIVERA, PRESIDENTE, peticionaria, *v.* SECRETARIO, DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR, recurrido.

*Número:* O-81-208     *Resuelto:* 29 de junio de 1982

*Olaguibeet A. López Pacheco,* abogado de la peticionaria; *Lucía Ferreira,* abogada del recurrido.

EL JUEZ ASOCIADO SEÑOR DÍAZ CRUZ emitió la opinión del Tribunal.

La querellada Equity de Puerto Rico, Inc. opera una librería en la que ofrece al público un número limitado de las decisiones de este Tribunal, editadas bajo el rubro de Decisiones de Puerto Rico (D.P.R.). Su actividad comercial en esta línea está regulada y restringida por los términos del contrato que el Tribunal anualmente somete a licitación en subasta. Como es usual en el género del librero, la querellada anuncia sus libros por catálogo y ocasionalmente por formatos breves.

El 28 enero, 1974, el abogado Sr. Francisco Martín Vélez solicitó de la querellada Equity que le vendiera los tomos del 1 al 46 inclusive, y el tomo 54 de las Decisiones. [1] A correo vuelto, el 30 enero, 1974, el gerente general de la librería contestó al comprador interesado tener disponibles los tomos 1, 3, 4, 5, 6, 7, 9, 12, 13, 14, 16, 17, 20, 21 y 24. Ya antes, el 18 enero, 1974, Equity le había aclarado por carta al abogado querellante el agotamiento de algunos de los volúmenes solicitados, entrando en pormenores sobre las dificultades para reimpresión debido a la escasez de papel, de tela de encuadernar, la congestión de trabajo en las imprentas y el alza inusitada en los costos de labor y material de imprenta. En los párrafos finales de dicha carta, el Sr. Ignacio Rivera, gerente general de la librería de referencia, le expresó al Lic. Martín Vélez lo siguiente:

Puede estar usted en la seguridad de que, dentro de la situación anormal en que se está desenvolviendo la industria, el comercio y aún la vida misma de cada ciudadano, estamos

---

[1] El catálogo general de obras de derecho ofrecidas por Equity para el año 1974 contenía la siguiente nota respecto a los tomos en cuestión:

DECISIONES DE PUERTO RICO

"Las Decisiones de Puerto Rico contienen el texto de las opiniones sobre los casos resueltos por el Tribunal Supremo de Puerto Rico. Cada tomo incluye un Índice Legal con las citas a códigos, leyes, reglamentos, jurisprudencia, obras de Derecho, etc. y un Índice de Materias para facilitar la búsqueda de los puntos de Derecho resueltos.

"Los siguientes tomos están a la venta por Equity: 1 a 83 y 88 a 100 (en español) y 88 a 97 (en inglés). Gustosamente brindaremos informes a quien lo interese respecto de cualesquiera tomos que se deseen adquirir."

haciendo toda clase de esfuerzos para ofrecer a los abogados y a los estudiantes de leyes el servicio a que todos legítimamente tienen derecho.

Le agradeceré en el mejor ánimo de resolverle su problema, me envíe una lista de los tomos que le faltan en su colección de Decisiones, con miras a tratar de conseguírselos en alguna forma.

Espero que usted comprenda nuestra situación y comparta con nosotros los inconvenientes que nos han salido al paso, los cuales tenemos la esperanza de poder ir resolviéndolos según los medios a nuestro alcance y dentro de un mercado tan pequeño como es el de Puerto Rico.

Atentamente suyo,

(Fdo.) Ignacio Rivera
Gerente General

Transcurridos siete meses de este intercambio de comunicación, el 11 septiembre, 1974, el letrado promueve la intervención del Departamento de Asuntos del Consumidor en carta que en lo pertinente expresa:

Acabo de recibir([2]) el catálogo general para el año 1974 que publica la Equity de Puerto Rico, Inc., y el cual acompaño a ésta. En la página nueve (9) de dicho catálogo informan tener en inventario los tomos de Decisiones de Puerto Rico del uno al ochenta y tres y del ochenta y ocho al cien (español) y del ochenta y ocho al noventa y siete (inglés). Me he comunicado con las oficinas de la Equity y me han informado que aunque en el catálogo se hace esa publicación, la misma no es cierta pues la realidad es que no cuentan con los tomos que dicen tener en existencia en el mismo.

Al encontrar incursa a la querellada en acto "que constituya o tienda a constituir fraude o engaño",([3]) el Departa-

---

([2]) Con la misma introducción de "[a]cabo de recibir nuestro [*sic*] catálogo general" se había dirigido a Equity de P.R., Inc. 7 meses antes, el 16 enero, 1974.

([3]) Objetivo del Art. 14, Ley Núm. 148 de 27 junio, 1968 (23 L.P.R.A. sec. 1014) aplicado, cuyo texto completo es:

*Sec. 1014. Actos, prácticas, anuncios o publicidad prohibidos*

"Se prohíbe todo tipo o clase de acto, práctica, anuncio o publicidad que constituya o tienda a constituir fraude o engaño en donde el artículo, producto o servi-

mento (DACO) impuso a la querellada multa de $200. Con fecha 16 marzo, 1981, el Tribunal Superior de San Juan la confirmó al resolver la apelación administrativa. Tanto la agencia como el tribunal erraron al no identificar en los hechos del caso elementos de excepción que lo excluyen de las prácticas o actos de comercio que se propuso sancionar la Asamblea Legislativa en legítimo esfuerzo para proteger al consumidor. Desde su incepción este caso se perfiló como incidente típico de agotamiento de inventario en las librerías y la querella debió desestimarse por ausencia de méritos, inserta a la fuerza dentro de un esquema legislativo dirigido contra la falsa representación lucrativa de algunos comerciantes.

El artículo de comercio en que trafica la querellada Equity de Puerto Rico consiste exclusivamente en libros relacionados con la enseñanza y práctica del Derecho. Los clientes de la editora demandada son ejercitantes de la profesión jurídica. No son consumidores desvalidos, ni mucho menos ignorantes. Al aprobarse la Ley Núm. 148 de 27 junio, 1968 (23 L.P.R.A. sec. 1001 y ss.), creadora de la Administración de Servicios al Consumidor fue principal preocupación de la Asamblea Legislativa, expresada en la Exposición de Motivos, el desvalimiento del consumidor frente a prácticas indeseables de comerciantes, que consignó así:

> Como consecuencia natural del rápido desarrollo económico experimentado en Puerto Rico en las últimas décadas, el consumidor puertorriqueño se enfrenta a un mercado de bienes y servicios sumamente complejo que se hace sentir y, en efecto, deja indefenso al consumidor. Así, la creciente naturaleza impersonal de nuestra sociedad cada vez más automatizada, la creciente distancia, entre el productor y el consumidor final, los cambios abruptos que se vienen produciendo en nuestro sistema de mercadeo tales como el establecimiento de

cio sea fálsamente representado o que cree en el consumidor una imagen o impresión errónea sobre la marca, precio, cantidad, tamaño, calidad, cualidad, salubridad o cualquier otra característica del producto, artículo o servicio."

grandes tiendas por departamentos, casas de descuentos, supermercados de auto-servicios (*self-service*) el creciente número de artículos y su variedad—todo ello contribuye a este estado de falta de conocimiento, consunción y desvalimiento en que se encuentra nuestro consumidor.

La situación se torna más delicada cuando se contempla el sinnúmero de prácticas indeseables que algunos comerciantes y manufactureros inescrupulosos llevan a cabo. Estas prácticas incluyen entre otras: anuncios engañosos, falsos descuentos en precios, rotulación defectuosa, garantías que no se cumplen, servicios que no se prestan, aumentos injustificados en los precios, cargos exorbitantes por concepto de intereses y servicios, la aparición de vendedores ambulantes representando a compañías fantasmas, y otras prácticas de igual naturaleza.

El explícito lenguaje del legislador no es flecha apuntada contra empresas de tráfico integrado, en parte, por actos comunes de comercio y, en una parte principal, por servicios a la educación del pueblo. No se dan en el presente caso las circunstancias de *falta de conocimiento, consunción y desvalimiento* en el consumidor, que impulsaron esta legislación. El que compra libros, como quien compra flores, sabe que su proveedor no podría existir con un inventario de inexorable rigidez que le someta a reproche y sanción porque en determinada fecha no pueda servir el libro de García Márquez o las gladiolas que figuraron en su catálogo o anuncio. El propósito de la Ley es prevenir y sancionar las prácticas injustas y deshonestas en el tráfico ortodoxo del comercio o la prestación de servicios. El manifiesto propósito de la norma que ha de concebirse en relación con la realidad social del tiempo en que ha de ser aplicada, excluye de la sanción del estatuto contra fraude o engaño, (Art. 14, Ley Núm. 148) los peculiares hechos de este caso, que si bien representan la ausencia en los anaqueles de la querellada de algunos de los 47 volúmenes que interesaba el querellante, la inmediata y franca explicación que sobre la transitoria deficiencia le comunicó a este último el Presidente y Gerente general de la querellada,

debió ser suficiente disuasivo de la querella que llegó a DACO después de un período de incubación de más de 7 meses, que aparentemente tomó al querellante la formación de juicio en cuanto a si había sido engañado por el anuncio o ilustrado por la información que le dio el librero sobre la peculiar naturaleza del negocio de venta al público de las Decisiones de Puerto Rico, y su sincera disposición a servirle en la obtención de los tomos que interesa, y no de lucrarse mediante el fraude y el engaño.

Las ofertas engañosas que la Ley persigue son usualmente aquellas promovidas con especial énfasis en las cualidades del producto, que en ocasiones comprende su número o cantidad, y por un periodo de tiempo relativamente corto, en las que el comerciante tiene por objetivo la realización apresurada de la mercancía, la venta inmediata de un inventario específico y preparado ad hoc. No es ésta la práctica del anunciante de libros para la venta, ni de las ofertas de cursos universitarios, mediante catálogos que necesariamente han de ser afectados por elementos imponderables en el extendido tiempo de su vigencia. No presenta este caso, ni la figura del consumidor ignorante, inepto en la protección de su interés propio ni la del comerciante inescrupuloso listo para hacer una ganancia rápida inducida mediante fraude o engaño.

*Con estos antecedentes y fundamentos, se expedirá el certiorari y se desestimará la querella.*

El Juez Asociado Señor Negrón García emitió opinión disidente a la que se unen el Juez Presidente Señor Trías Monge y el Juez Asociado Señor Irizarry Yunqué.

—O—

Opinión disidente del Juez Asociado Señor Negrón García a la cual se unen el Juez Presidente Señor Trías Monge y el Juez Asociado Señor Irizarry Yunqué.

En estricta juridicidad no procede la súplica de la peticionaria Equity de Puerto Rico, Inc. de que revoquemos la

sentencia del Tribunal Superior, Sala de San Juan. Dicho foro judicial revisó el caso administrativo y confirmó la decisión del Departamento de Asuntos del Consumidor (DACO), que le impuso una multa administrativa de $200 por infracción al estatuto sobre anuncios engañosos.

La querella la originó el Lcdo. Francisco Martín Vélez, por alegada violación consistente en que Equity anunció que tenía disponibles para la venta una serie de volúmenes de las Decisiones de Puerto Rico (D.P.R.), cuando en realidad no los tenía.

El precepto legal involucrado es el Art. 14 de la Ley Núm. 148 de 27 de junio de 1968 que "prohíbe todo tipo o clase de acto, práctica, anuncio o publicidad que constituya o *tienda a constituir* fraude o *engaño*, en donde el artículo, producto o servicio sea *falsamente representado o que cree en el consumidor una imagen o impresión* errónea sobre la marca, precio, *cantidad*, tamaño, calidad, cualidad, salubridad o *cualquier otra característica* del producto, artículo o servicio. (Énfasis suplido.) 23 L.P.R.A. sec. 1014.

Equity aduce y discute como errores: (1) que el tribunal sentenciador confirmara la decisión sin tener el expediente administrativo una transcripción o exposición narrativa ni recomendación del examinador; y (2) no tomar conocimiento judicial de la ley que autoriza al Tribunal Supremo a conceder permiso de reimpresión de los volúmenes agotados de D.P.R. y calificar de alegaciones el testimonio de su testigo principal, su Presidente y Gerente General, Sr. Ignacio Rivera García. Al evaluar estos señalamientos y estimar, de modo preliminar, que carecían de méritos[1] —por estar intrínsecamente relacionados— pedimos a las partes que

---

[1] El análisis posterior confirma esa impresión. En cuanto al primer apuntamiento, según Resolución de 16 de junio de 1973, el foro de instancia reclamó y tuvo ante sí el expediente administrativo. Independientemente, su propio recurso allí instado no cuestionaba las determinaciones fácticas esenciales de DACO. Respecto al segundo, aun cuando el tribunal a quo caracterizó como "alegación" el testimonio del señor Rivera en el sentido de que Equity no podría imprimir más volúmenes sin el permiso de este Tribunal, ello sería inconsecuente. Obviamente es materia de conocimiento judicial.

nos ilustraran sobre el concepto de "fraude o engaño" en la ley, "a la luz de los hechos presentes en el caso de autos". Las partes han comparecido a su oportuno tiempo.

I

Con referencia al trasfondo de hechos, el tribunal sentenciador correctamente concluyó:

Está expresamente admitido por Equity que el catálogo (léase anuncio) que motiva este procedimiento se imprimió a fines de 1973 para tener vigencia en enero de 1974. En su señalamiento de error a este Tribunal alega que aunque algunos de los tomos que se anunciaban en dicho catálogo se agotaron *ello ocurrió después de circulado el catálogo.* En su moción de reconsideración a DACO la alegación sobre el particular es más específica. Se alega que los tomos se agotaron debido a que "debido al excesivo número de abogados que han jurado durante los últimos años los referidos tomos tuvieron *durante los primeros meses del año 1974* una venta no esperada, agotándose algunos. A principios del mes de septiembre de 1974 el querellante solicita la compra de los tomos del volumen 1 al 46 y el volumen 54. Se le informó entonces que algunos de éstos estaban agotados". (Énfasis añadido). *Sin embargo la prueba documental demuestra que la solicitud del querellante en este caso no fue en septiembre del 1974 sino a principios de enero de 1974.* Y la carta del 18 de enero de 1974 al querellante firmada por el Gerente General de Equity explica que los volúmenes estaban ya agotados para esa fecha "debido a la excesiva demanda . . . *durante los últimos años".* (Énfasis añadido). *Lo anterior refleja claramente que desde los primeros días de estar en vigor el catálogo que nos ocupa los volúmenes que se anunciaban en el mismo como disponibles estaban ya agotados.* No podía ser más clara la violación a la legislación sobre anuncios engañosos. (Escolios omitidos.) (Énfasis nuestro.)

En síntesis, aunque la teoría de Equity es que los tomos se agotaron debido a un aumento imprevisto en la demanda, corolario de un incremento en la matrícula de abogados, precisamente ésta, para el 18 de enero de 1974, admitió que los volúmenes estaban agotados "debido a la excesiva

demanda que los mismos han tenido durante *los últimos años*". (Énfasis nuestro.) O sea, aceptó que mucho antes de circular voluntariamente su catálogo, en parte, el mismo estaba obsoleto en lo referente a la disponibilidad de los tomos anunciados de D.P.R.

## II

En las circunstancias apuntadas debe prevalecer el dictamen judicial y la multa administrativa.

No existe controversia —ni puede haberla— en que la actividad comercial de Equity y el catálogo que origina el caso era un *anuncio* al amparo de la ley. Entre sus diversas acepciones, la palabra "anuncio" significa "[h]acer pública una oferta o demanda de cosas vendibles, prestaciones, servicios, colocaciones, etc.". *Diccionario de la Real Academia de la Lengua Española*, 1970, pág. 97. La forma material y el medio en que se imprima y circule —hoja suelta, folleto o catálogo, sea por vía personal, prensa, etc.— no desvirtúa su carácter.

Más aún, nuestra jurisprudencia, que reconoce el interés público que anima esta legislación, es enteramente aplicable. Siguiendo los enfoques federales en casos análogos, hemos resuelto que en su sentido literal, el anuncio no tiene que ser falso. La determinación final dependerá de la idea o noción que tienda a crear en el público consumidor —sea o no sofisticado— a base de la interpretación más adversa al anunciante sobre el contenido de la palabras usadas y lo que pueda entenderse por implicación. Tampoco resulta menester demostrar la intención de engañar, ni si en efecto se logró ese propósito. *Garage Rubén, Inc.* v. *Tribunal Superior*, 101 D.P.R. 236, 244–245 (1973).

Es en virtud de esas pautas doctrinales que se impone la confirmación de la sentencia. En el proceso de adjudicación objetiva de estos casos, debemos tener presente los dos intereses en tutela del estatuto, a saber, el público y el individual. Ciertamente, es innegable que el anuncio que nos

ocupa fue circulado cuando no reflejaba la verdadera realidad. Resulta irrelevante para fines decisorios que su circulación se debiera a negligencia o a falta de diligencia por parte de Equity en actualizar o modificar el anuncio a tono con el momento, así como que sus clientes sean abogados o estudiantes de Derecho. El elemento de intención no es por sí determinante. El anuncio tendía a crear en el posible consumidor la errónea expectativa e impresión de la cantidad que estaba disponible para la venta, de los tomos anunciados (1 al 83 en español). En la medida en que se aparta de esa realidad, el anuncio representa un engaño dentro del significado y espíritu de la ley. Obsérvese que la omisión gira sobre un hecho material y esencial, esto es, una característica primordial de los artículos para la venta, su cantidad, ya que la adquisición de una colección incompleta de esta naturaleza, afecta su valor y utilidad forense. Para Equity, comunicar la idea de que todos los tomos estaban asequibles constituía una promoción más atractiva y efectiva dirigida al posible consumidor, en contraste con el anuncio fiel y exacto de un inventario incompleto y limitado. La inexactitud le beneficiaba, pues lograba captar, generar y reclutar la atención de un mayor número de posibles compradores en dos vertientes: (1) de quienes interesaban adquirir toda la colección; y (2) de quienes sólo deseaban algunos volúmenes en específico.

### III

Finalmente, no alcanzamos a comprender cómo el requisito legal de que Equity necesitaba autorización administrativa de este Tribunal para reimprimir los tomos agotados, puede ser argumento persuasivo que le justificara incurrir en la práctica vedada por la ley. Ello no se discute. En lo que no tiene razón, es en invocar la ausencia de tal autorización como eximente, pues no precisaba de ningún permiso para reeditar y modificar su anuncio, con diligencia y previsión, antes de circularlo. Es su fidelidad, no las

razones por las que se hayan agotado los volúmenes, lo que está bajo nuestra consideración. Ni los hechos del caso ni su proceder constituyen excusa legal suficiente para establecer excepción alguna que vulnere la efectividad del estatuto.

Disentimos.